UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------------- X

JACK PIUGGI,

                *Plaintiff*,

      - against –

GOOD FOR YOU PRODUCTIONS LLC, GRAND STREET MEDIA INC., WARNER BROS. DISCOVERY, INC., HOME BOX OFFICE INC., and DOES 1-25 *being other affiliated entities and individuals whose names and wrongdoings will be revealed in the course of discovery*

                *Defendants*,
-------------------------------------------------------------------- X

INDEX NO.:

JURY TRIAL DEMANDED

Plaintiff Jack Piuggi ("Plaintiff" or "Mr. Piuggi"), in accordance with 17 U.S.C.A. § 501 et seq. as and for his Complaint, against defendants Good For You Productions LLC[1] ("GFY"), Grand Street Media, Inc. ("Grand Street Media"), Warner Bros. Discovery, Inc., ("Warner"), Home Box Office, Inc. ("HBO"), and DOES 1-25 being other affiliated entities and individuals whose names and wrongdoings will be revealed in the course of discovery ("Defendants"), alleges with personal knowledge as to his own actions, and upon information and belief as to those of others, as follows:

### I.     PRELIMINARY STATEMENT

1. This is a case for copyright infringement, breach of contract, and breach of covenant of good faith and fair dealing which arises out of Defendants' intentional breach of non-disclosure agreements with Plaintiff during the course of incorporating

---

[1] https://opencorporates.com/companies/us_ny/3805656; See also https://www.youtube.com/@GoodForYouProductions/about and https://apps.dos.ny.gov/publicInquiry/EntityDisplay which lead to the same Westchester LLC with the registered address in Valencia CA.

Plaintiff's copyrighted work, titled "Instafamous," into a documentary-style reality TV show, as well as Defendants' subsequent actions that effectively appropriated Plaintiff's copyrighted work for a TV show airing on HBO.

2. While working with Defendant GFY to develop "Instafamous", Plaintiff noticed, on multiple occasions, that many of his concepts for "Instafamous" were appropriated by "Fake Famous," a documentary film, by Defendant HBO, of similar genre that started airing a month after Plaintiff and GFY began working on Instafamous.

3. Upon information and belief, Defendants GFY and Grand Street Media have likely worked in tandem with Plaintiff's former counsels, Rebel Roy Steiner Jr. and Bennett Fidlow of Loeb & Loeb LLP, to appropriate "Instafamous" from Plaintiff.

4. According to plaintiff, a young creative personality, "*the bullies of this industry have had their day, but today belongs to the little guys: the creators whose ideas (until now) were routinely snatched away with little recourse more than hush money. But, this little producer's soul is not for sale*."

5. Efforts to resolve this matter without court intervention were unsuccessful. (See Exhibit A – Letter form Hantman & Associates dated August 18, 2022).

   II.     **PARTIES AND RELEVANT NON-PARTIES**

6. Plaintiff, Jack Piuggi, is, and at all times relevant herein was, a New York resident. Plaintiff formed Flipp Productions, LLC in 2018, and had been working on "Instafamous" with Defendant GFY, and Grand Street Media in the capacity of Flipp Productions.

7. Defendant Home Box Office, Inc. is a Delaware Corporation headquartered at 30 Hudson Yards, New York, New York. HBO is a multinational media company that funded and produced "Fake Famous" and "FBOY Island."

8. Defendant Good For You Productions LLC is a New York Limited Liability Company with its registered address in Valencia CA and its principal place of business in the State of New York. It is a citizen of New York pursuant to 28 U.S.C. § 1332(c). GFY is a media production LLC.

9. Defendant Grand Street Media, Inc. is a New York Corporation with its registered address and principal place of business in the State of New York. It is a citizen of New York pursuant to 28 U.S.C. § 1332(c). Grand Street Media is a media production company.

10. Defendant Warner Bros. Discovery, Inc., ("Warner") is a New York Corporation headquartered at 230 Park Avenue South in Midtown Manhattan, New York City. It is a citizen of New York pursuant to 28 U.S.C. § 1332(c).

11. Non-Party Rebel Roy Steiner Jr. is an attorney of law, of Loeb &Loeb LLP, registered to practice in the State of California. He was retained by Plaintiff in 2018. He also represents HBO, whose documentaries, titled "FBOY Island" and "Fake Famous," appropriate many elements of "Instafamous" verbatim.

12. Non-Party Bennett Fidlow is an attorney of law, of Loeb & Loeb LLP, registered to practice in the State of California and the State of Virginia. He worked closely with Defendant Rebel Roy Steiner Jr. in the representation of Plaintiff.

13. Non-Party Garrett Morosky is an actor and a friend of Plaintiff. He alluded to Plaintiff on several occasions that Defendants appropriated "Instafamous" for the production of "FBOY Island."

14. Non-Party Mark "Cory" Rooney is a record producer who introduced Maurice Freedman of Zaah Holdings, Inc. to Plaintiff in 2018.

15. Non-Party Maurice Freedman is the founder and CEO of Zaah Holdings, Inc., a New York Corporation. In 2018, He referred Plaintiff to his brother Lowell Freedman, who is owner operator of Grand Street Media with partner Jesse Guma.

### III.    JURISDICTION AND VENUE

16. This Court has subject matter jurisdiction over this case pursuant to 28 U.S. Code § 1331. The federal question jurisdiction enabling statute provides federal district courts with original jurisdiction over all civil actions arising under U.S. law. Pursuant to 28 U.S. Code § 1338(a), federal question exists in this case, as the nucleus of the issue implicates 17 U.S.C.A. § 501, an Act of Congress relating to copyright infringement.

17. This Court has personal jurisdiction over this case. As found by the Supreme Court of the United States in *Goodyear Dunlop Tires Operations, S.A. v. Brown*, 131 S. Ct. 2847 (2011) and *Daimler AG v. Bauman*, 134 S. Ct. 746 (2014), a court's exercise of general in personam jurisdiction over an entity is determined by whether the entity is incorporated in the forum state or has its principal place of business there.

18. Defendants' principal places of business are located in New York. Hence, this Court has personal jurisdiction over the defendants.

19. This Court also has supplemental jurisdiction for the State Law claims alleged in this Complaint which include breach of contract, and breach of covenant of good faith and fair dealing.

20. Defendants' actions that give rise to these State Law claims revolve around Defendants' actions to appropriate Plaintiff's copyrighted work, which constitutes the same case and controversy giving rise to the Copyright Infringement claim as stipulated in 28 U.S. Code § 1367(a).

21. The amount in controversy alleged in the State Law claims exceeds the sum or value of Seventy-Five Thousand Dollars ($75,000.00), exclusive of interest and costs.

22. Venue is appropriate as actions complained of herein occurred in New York City and in copyright litigation cases, venue is found appropriate in any district where, if the district was a state, the defendant would be subject to personal jurisdiction. *Vasquez v. Torres Negron*, 434 F. Supp. 2d 199, 202 (S.D.N.Y. 2006). See also 28 U.S.C. § 1400(a).

## IV.    FACTS

23. On January 2, 2021, Mr. Piuggi, owner of Flipp Productions, LLC, conceived "Instafamous," a documentary-style reality TV show incorporating an underlying faux-dating show competition.

24. "Instafamous" would both expose the superficiality of Instagram, 2020s dating culture, while simultaneously causing the contestants (former "friends" of Mr. Piuggi's) to reveal their true and selfish nature.

25. Having been previously introduced by lifelong family friend, mentor and celebrity record producer Mark "Cory" Rooney, via Maurice Freedman of Zaah Holdings, Mr. Piuggi chose to share his concept with Freedman's brother, Lowell, owner operator of Grand Street Media along with business partner Jesse Guma.

26. After having Lowell Freedman sign a non-disclosure agreement to protect his rights, and a 22-minute phone call where he expressed the synopsis, and where Mr. Guma acknowledged his understanding of Mr. Piuggi's concept by calling it "the dating show where no one finds love", Mr. Piuggi emailed Freedman the 40-pages of documentation outlining the concept.

27. Mr. Piuggi emailed documents to Grandstreet Media in an effort to create a timestamp as well as attached to Google Doc after their initial call in an additional attempt to protect his intellectual property.

28. Mr. Piuggi later completed registration of his copyright with the United States Copyright Office on December 13, 2022. (Exhibit B – Copyright Registration)

29. On January 13, 2021 Mr. Freedman communicated with Mr. Piuggi via text message that he was delayed in responding because "we have a major project that's been thrown in our lap."

30. The following morning, Mr. Guma told Mr. Piuggi that Grand Street will pass on the project but referred him to Jeff Cobelli of GFY.

31. Mr. Cobelli signed a non-discloser agreement with Mr. Piuggi on January 15, 2021, and during a video conference on January 19, 2021, Mr. Piuggi re-pitched the concept of INSTAFAMOUS to Mr. Cobelli, who loved the idea, including the notion that all of their pre-production calls be recorded for a behind-the-scenes documentary effect.

32. On January 21, 2021 (19 days after Mr. Piuggi pitched the concept of "Instafamous" to Grand Street), the trailer for "Fake Famous," a similarly themed documentary by HBO, was released.

33. Later that day, Mr. Piuggi, unaware of the HBO documentary, had a recorded call with the full team at GFY (Cobelli, Natalie Chau and Christopher Tinger), during which he re-pitched the entire concept and, when Mr. Piuggi began pitching the dating elements, before he could review his "backstabbing friends" role, Mr. Cobelli redirected the conversation, suggesting that the dating element should be pulled out as a separate show.

34. Later that day (and still unaware of the "Fake Famous" trailer), Mr. Piuggi called the attorneys whom he retained when he created Flipp Productions, Rebel Roy Steiner Jr. and Bennett Fidlow, Senior partners of Loeb & Loeb, LLC, to update them on what he's been developing with GFY and Grand Street.

35. During this call Steiner (who simultaneously represented HBO) emphatically cautioned multiple times that Mr. Piuggi should be very wary of the production companies he's working with, adding very specifically as he stated that "*I don't trust whoever this production company is that you've hired [Grandstreet], they*

*are not who they say they are. They are HBO, and they are ripping you off.*" He counselled Mr. Piuggi to cease all development until he had a contract in place.

36. After this call, recognizing Mr. Steiner's behavior as erratic as Mr. Piuggi was previously aware that Steiner simultaneously represented HBO, Mr. Piuggi retained David Fritz, esq. as his legal representation for this project.

37. Mr. Fritz recommended that Mr. Piuggi continue to record all communications with the parties involved, unless he was in a jurisdiction where he was legally unable to do so.

38. On January 26, 2021 as Cobelli was escorting Mr. Piuggi from the building following a 4-hour meeting at GFY studios (recorded by GFY), Mr. Piuggi asked if Mr. Cobelli has ever made anyone famous. He said he hadn't, but noted that he DID have a show stolen from him.

39. On the recommendation of Mr. Fritz, on February 1, 2021, Mr. Piuggi paid GFY $2,500 as a 50% good-faith deposit for the first phase of the development of "Instafamous," which established Mr. Piuggi as the executive producer of his work.

40. Subsequently, to plaintiffs surprise "Fake Famous' aired on HBO unbeknownst to Mr. Piuggi and which he believes was based on his copyrighted material and subsequent work product.

41. After Mr Piuggi entered into this implied contract with GFY, however, Mr. Cobelli evidenced erratic when discussing and working with Mr. Piuggi on the "Instafamous" project with Plaintiff.

42. On February 3, 2021, during a two-hour recorded call, Mr. Cobelli and his team alluded, on several occasions, that they adopt a certain editing styles and plot points that would later be revealed as part of "Fake Famous."

43. During this phone call, GFY also informed Mr. Piuggi of "Fake Famous" and even alluded that "Fake Famous" shares many similar thoughts [and] "*They did not use their own resources…They did not have the idea.*"

44. Mr. Cobelli also suggested that they should advance without a written contract and instead use a one-page agreement, while also alluding that contracts "ensure that concepts don't get stolen," which inevitably contradicts with their goal to materialize "Instafamous" without any undue hinderance of copyright infringement or appropriation.

45. During this call, Mr. Cobelli also confirmed you can film a show in days and make it appear to have taken place over the course of months.

46. On February 5, 2021 Mr. Piuggi told GFY that his friend Garrett Morosky would be a good cast member for "Instafamous."

47. Hours later, Mr. Morosky received a call from Ms. Chau, and it was announced by his girlfriend at the time that he had been cast in HBO's "first ever documentary style reality show" – later revealed as "FBoy Island."

48. Immediately following this announcement, Mr. Piuggi for the first time watched the "Fake Famous" trailer and realized his concepts were being fed to HBO. Convinced that he would be credited as a producer, the following day Mr. Piuggi made an ad for the show and posted it on Instagram – hoping to get some traction on production since it appeared the show had started without him.

49. Then, Mr. Piuggi texted Grand Street asking for credit on "Fake Famous," but they denied any connection to HBO or Fake Famous, despite evidence to the contrary – such as Mr. Freedman's involvement in the Sopranos, an HBO hit series, and Mr. Guma's previous partnership with Warner, HBO's parent company, and STX which will ultimately become the production company responsible for FBOY Island.

50. It is also important to note that Mr Rooney, who connected Mr. Piuggi with all parties, has a new record label, TLR Music Group, that is also a current partner of Warner.

51. On February 9, Mr. Piuggi had a recorded call with Loeb & Loeb attorneys Steiner & Fidlow.

52. When Mr. Piuggi asked them about "Fake Famous" and displayed confusion as to the striking similarity of "Fake Famous" and "Instafamous,"

53. Mr. Steiner denied the inference that they appropriated "Instafamous" for HBO's "Fake Famous," dismissed Mr. Piuggi's corollary that HBO would film and edit a documentary in two days, and again alluded that GFY and Grand Street Media could very likely steal Mr. Piuggi's idea.

54. During that call, the attorneys also re-confirmed that they represented HBO, and admitted they "might have" said "InstaFamous" sounds a lot like the HBO shows, and suggested it would be too difficult and costly to try and sue HBO – because infringement is hard to prove.

55. On February 10, 2021 during a recorded call with GFY, Mr. Piuggi learned that the company was refusing to sign the contract. Mr. Cobelli also confirmed that

they can "…film in 2 days and make it look like it took a year, if we wanted," and said the editing process could be 1-2 months, confirming the plausibility of the production timeline of "Fake Famous."

56. On March 21, 2021, Mr. Piuggi received a call from Mr. Morosky from the set of "FBoy Island" and said filming was going great, then producers rushed him off the call.

57. This is notable, because according to the rules of the set, cast members were allowed phone calls only once per week for 20 minutes.

58. During a recorded call on March 26, 2021, Mr. Cobelli admitted that he shared information about Mr. Piuggi's show (in breach of NDA) with Chris Lewick (sp), a camera operator for American Chopper, another Warner-owned brand

59. He later admitted again of breaching the NDA, alluding that "someone can take a concept and use it to make an adaptation" (i.e. by utilizing the defense of a "parallel idea"). "If your idea is good enough, you should be able just to sell it on paper."

60. On the same call, Ms. Chau also confirmed how to make a few days of filming look like a year, by manipulating sun positioning and using fake backgrounds.

61. Mr. Cobelli also explained to Mr. Piuggi that pitching to Warner-owned brands "HBO & Discovery" is only done by "knowing someone who knows someone".

62. He also confirmed Mr. Piuggi's notions that there is a direct connection between himself (GFY) and Warner via Mr. Rooney, Maurice Freedman, and Grand Street; and that Warner operates as separate independent contractors, to be

production companies and partners, but that if there are too many attached to the project then "the network doesn't want to split profits 15 ways."

63. On April 8, 2021 after Mr. Piuggi confronted Mr. Cobelli about the rare coincidence that a video set was filming in his hometown – at the exact location he had suggested for a scene in his show – Mr. Cobelli confirmed he is aware that he was under an NDA and that, if GFY did in fact steal the concept, "if we did that, you have the power to sue us."

64. About one week later, on April 16, 2021 Mr. Piuggi received an email from GFY, informing him that he's been dropped as a client.

65. On April 19, Mr. Piuggi got a call from Mr. Morosky, telling him, "I just won your TV show… It's called FBOY Island… you can't tell anyone I told you that."

66. He confirmed the show would air in June on HBO Max (the show aired July 29).

67. He also said they sent him a contract to do a spinoff. Telling Mr. Piuggi about the show, Mr. Morosky says, "You met me a little less than a year ago, … your boy hit the show, right after my birthday…" (This confirms he was cast for the show after he met Mr. Piuggi).

68. Garrett then described the elements of the show, much of which is pulled word-for-word from Mr. Piuggi's original concept.

69. When Mr. Piuggi sought to settle his bill with Loeb & Loeb on May 19, 2021, the firm denied all work done on Mr. Piuggi's behalf, asserting that the retainer no longer existed.

70. The firm claimed that several calls between Mr. Piuggi, Mr. Steiner, and Mr. Fidlow never occurred, notwithstanding the email exchanges that book the alleged calls and Mr. Piuggi's records for these calls.

71. On September 21, 2021, Mr. Morosky told Mr. Piuggi, "We all know what happened, they stole your show."

72. In December 2021, Mr. Piuggi conducted a recorded in-person interview (under the pretense he was filming season 2) with Mr. Morosky, during which Mr. Morosky revealed the network did not pay his reward money of $100,000.

73. He also said (when he thought the cameras were off) "You wanna know how Hollywood works? Watch the Truman Show."

74. In sum, the erratic behaviors from Defendants herein lead Mr. Piuggi to the ironic reality that, through concerted effort, Defendants appropriated "Instafamous" for the production of "Fake Famous" and "FBOY Island."

75. Further, Mr. Piuggi alleges that Defendants and other major studios have developed a clever system that allows them to steal show concepts through the use of independent contractor entities with 1099 status, while they and these independent contractors identify all protected content as 'parallel ideas,' in an attempt to insulate themselves from legal proceedings.

### V.     LEGAL CLAIMS

### FIRST CLAIM
### FEDERAL COPYRIGHT INFRINGEMENT

76. Plaintiff repeats and realleges each and every paragraph above as if said paragraphs were more fully set forth herein at length.

77. "Instafamous" is an original reality TV production concept containing copyrightable subject matter for which copyright protection exists under the Copyright Act, 17 U.S.C. § 101, et. seq.

78. Plaintiff is the exclusive owner of rights under copyright in and to the Copyrighted Work. Plaintiff owns a valid copyright registration for the Copyrighted Work, attached as Exhibit B.

79. Through Defendants' conducts alleged herein resulting in concerted appropriation of the Copyrighted Work without Plaintiff's permission, Defendants have directly infringed Plaintiff's exclusive rights in the Copyrighted Work in violation of Section 501 of the Copyright Act, 17 U.S.C. § 501.

80. On information and belief, Defendants' infringing conducts alleged herein were willful and with full knowledge of Plaintiff's rights in the Copyrighted Work, and has enabled Defendants illegally to obtain profit therefrom.

81. As a direct and proximate result of Defendants' infringing conduct alleged herein, Plaintiff has been harmed and is entitled to damages in an amount to be proven at trial.

82. Pursuant to 17 U.S.C. § 504(b), Plaintiff is also entitled to recovery of Defendant's profits attributable to Defendant's infringing conduct alleged herein, including from any and all sales of the Copyrighted Work and products incorporating or embodying the Copyrighted Work, and an accounting of and a constructive trust with respect to such profits.

83. Alternatively, Plaintiff is entitled to the maximum statutory damages pursuant to 17 U.S.C. § 504(c), for Defendants' willful infringing conduct/for each of Plaintiff's

works that Defendants have infringed, and for such other amount as may be proper pursuant to 17 U.S.C. § 504(c).

84. Plaintiff further is entitled to its attorneys' fees and costs pursuant to 17 U.S.C. § 505.

85. As a direct and proximate result of the Defendants' infringing conduct alleged herein, Plaintiff has sustained and will continue to sustain substantial, immediate, and irreparable injury, for which there is no adequate remedy at law.

86. On information and belief, unless Defendant's infringing conduct is enjoined by this Court, Defendants will continue to infringe the Copyrighted Work. Plaintiff therefore is entitled to preliminary and permanent injunctive relief restraining and enjoining Defendant's ongoing infringing conduct.

## SECOND CLAIM
## BREACH OF CONTRACT

87. Plaintiff repeats, realleges, and restates each and every paragraph above as if said paragraphs were more fully set forth herein at length.

88. By failing to oblige the Non-Disclosure Agreements entered into, Defendants Grand Street Media and GFY have breached their promises to Plaintiff under the NDA.

89. By failing to fulfill the terms of the oral agreement, Defendant GFY has breached its promises to Plaintiff under the Contract.

90. As a direct and proximate result of Defendants' breaches of their contractual obligations, Plaintiff has suffered and/or will suffer damages believed to be in excess of $15,000,000.00 dollars, exclusive of the damages to Plaintiff's goodwill and reputation.

91. By reason of Defendants' breaches of the Contract, Plaintiff has suffered damages in an amount to be determined at trial, but in no event less than $15,000,000.00 plus interest, costs, and disbursements.

## THIRD CLAIM
## BREACH OF THE IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING

92. Plaintiff repeats, realleges, and restates each and every paragraph above as if said paragraphs were more fully set forth herein at length.

93. In every contract there is an implied covenant of good faith and fair dealing that requires, among other things, that each party to the contract: (a) take no action to deny the other party the benefits of the agreement, and (b) do everything within its capacity to ensure that the other party enjoys the benefits of that agreement.

94. By reason of the Contract, Defendant GFY covenanted to perform in good faith and deal fairly with Plaintiff in all respects related to the subject matter of the Contract.

95. The implied covenant of good faith and fair dealing prohibited conduct by GFY which prevented or impaired, or would tend to prevent or impair, Plaintiff from enjoying the benefits of the Contract.

96. Plaintiff has at all times fulfilled all conditions, covenants and promises it was required to perform under the Contract with GFY.

97. By its actions GFY has prevented Plaintiff from enjoying the benefits of the Contract and has deprived Plaintiff of its ability to receive the economic benefit from its relationship with GFY.

98. As a direct and proximate result of GFY's breach of the duty to deal with Plaintiff fairly and in good faith, Plaintiff has suffered and/or will suffer damages believed

to be in excess of $15,000,000.00 dollars, exclusive of the damage to Plaintiff's goodwill and reputation.

99. By reason of the foregoing, Plaintiff has suffered damages in an amount to be determined at trial, but in no event less than $15,000,000.00, plus interest, costs, and disbursements.

## FOURTH CLAIM
## UNJUST ENRICHMENT

100. Plaintiff repeats, realleges, and restates each and every paragraph above as if said paragraphs were more fully set forth herein at length.

101. Plaintiff is entitled to recover under the doctrine of unjust enrichment if it is determined that either a valid and enforceable contract does not exist, the existing contract does not cover the subject matter of the dispute between Plaintiff and Defendant GFY, or the existing contract is void, invalid, or unenforceable.

102. On or before January 29th, 2021, Plaintiff provided to Defendant GFY a physical, 40-page copy of "Instafamous."

103. On or before January 4th, 2021, Plaintiff provided to Defendant Grand Street Media a physical, 40-page copy of "Instafamous."

104. Defendant GFY was enriched by virtue of Plaintiff's provision of "Instafamous" by virtue of secretly appropriating "Instafamous," a copyrighted work, for the use of Defendant HBO's reality TV programs "Fake Famous" and "FBOY Island."

Defendant GFY was aware and had knowledge that Plaintiff was not providing the benefit gratuitously and that Plaintiff's copyrighted work had value.

17

105. Plaintiff has demanded that Defendant GFY make restitution to Plaintiff for the use of Plaintiff's work and Defendant GFY has refused to do so.

106. Plaintiff and Defendant GFY had a sufficiently close relationship or connection as to cause reliance or inducement by Plaintiff.

107. As a result of Defendant GFY's appropriation of "Instafamous," Plaintiff has suffered actual and significant damages.

108. For the reasons set out above, it is against equity and good conscience to permit Defendant GFY to appropriate "Instafamous" that Plaintiff provided.

## VI. PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays that this Court enter judgment in its favor against Defendants as follows:

a. That the defendants, their representatives, agents, officer, employees and all persons in active concert or privity or in participation with them, be permanently enjoined form directly or indirectly infringing on Plaintiff's copyright, unfairly continuing to market, offer, sell, dispose of, license lease, transfer, display, advertise, reproduce, develop or manufacture any works derived from the Instafamous or participate or assist in any such activity

b. That Defendant be required to account for all profits, income, receipts, or other benefits derived by Defendant as a result of its unlawful conduct;

c. That all gains, profits and advantages derived by Defendant's from their acts of infringement be deemed to be held in constructive trust for the benefit of Plaintiff;

d. That the plaintiffs be awarded all allowable damages under the Copyright Act, including but not limited to statutory or actual damages, including damages incurred as

a result of plaintiffs licensing revenue and defendants' profits attributable to the infringement of plaintiffs' rights in an amount to be proven at trial;

e. That the plaintiffs be awarded pre-judgment interest as allowed by law;

f. On the First Cause of Action, judgement for damages in an amount to be determined at trial, plus interest, costs, and disbursements;

g. On the Second Cause of Action, judgement for damages in an amount to be determined at trial, plus interest, costs, and disbursements;

h. On the Third Cause of Action, judgement for damages in an amount to be determined at trial, plus interest, costs, and disbursements;

i. On the Fourth Cause of Action, judgement for damages in an amount to be determined at trial, plus interest, costs, and disbursements;

j. Judgment awarding all costs and attorneys' fees incurred by Plaintiff in the prosecution of this action;

k. Judgment awarding punitive damages to the extent allowable under applicable law;

l. Judgment granting such other and further relief as the Court may deem just and proper.

### VII.  DEMAND FOR JURY TRIAL

Plaintiff demands a trial by jury on all issues.

Dated: New York, New York
May  2, 2023

                              Respectfully submitted,


                              By:   /s/ Robert J. Hantman
                                    Robert J. Hantman, Esq.
                                    Hantman Associates

  www,hantmanlaw.com
Attorneys for Plaintiff
 1120 Avenue of the Americas, 4th Floor
New York, New York 10036
(212) 684-3933
rhantman@hantmanlaw.com